IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**ENTERGY ARKANSAS, LLC**                                                                                  **PLAINTIFF**

v.                                          Case No. 4:20-cv-01088-KGB

**TED J. THOMAS, in his official capacity
as Chairman of the Arkansas Public Service
Commission; and KIMBERLY A.
O'GUINN and JUSTIN TATE in their
official capacities as Commissioners of the
Arkansas Public Service Commission**                                                                  **DEFENDANTS**

## ORDER

Plaintiff Entergy Arkansas, LLC ("EAL") filed a complaint for declaratory and injunctive relief against defendants Ted J. Thomas, Kimberly A. O'Guinn, and Justin Tate in their official capacities as members of the Arkansas Public Service Commission (jointly "APSC") (Dkt. No. 1). APSC filed a timely motion to dismiss for failure to state claims upon which relief can be granted and motion to hold further proceedings in abeyance (Dkt. No. 15). EAL responded in opposition to the motion to dismiss, and APSC replied (Dkt. Nos. 20, 21, 22). The Court held a telephonic hearing on the motion with counsel for both parties (Dkt. No. 26). The parties also briefed the Court on the United States Court of Appeals for the District of Columbia Circuit's decision in *Entergy Services, Inc. v. FERC*, Nos. 17-1251 et al. (July 13, 2021) (Dkt. Nos. 33-38). For the following reasons, the Court denies the motion to dismiss and denies as moot the request to hold further proceedings in abeyance (Dkt. No. 15).

### I.     Factual and Procedural History

As this section of the Order explains in more detail, the instant case arises from a complaint filed by the Louisiana Public Service Commission ("LPSC") under § 206 of the Federal Power

Act ("FPA").[1]  *See* 16 U.S.C. § 824; 165 F.E.R.C. ¶ 61022 at 1.  LPSC alleged that EAL violated the System Agreement through an accounting error.  165 F.E.R.C. ¶ 61022 at 1.  As a result of LPSC's complaint, the Federal Energy Regulatory Commission ("FERC") ordered EAL to pay $135,037,914 to compensate other members within the Entergy System for the accounting error (Dkt. No. 1, ¶¶ 1, 4).  EAL's complaint in this case challenges a July 1, 2020, APSC Order (the "July 1, 2020, Order") denying EAL's application for approval of a retail rate allowing it to receive $135,036,833 from its retail customers; the APSC denied EAL's request and instead ordered EAL to credit $13,709,000 plus interest to EAL's retail customers (Dkt. No. 1, ¶ 6).  EAL now seeks to recover $135,036,883 of this FERC-Ordered Payment[2] from its retail customers by challenging the APSC's July 1, 2020, Order (*Id.*, ¶ 1).

The facts underlying EAL's application and the July 1, 2020, Order denying that application, drawn from the parties' filings, are as follows.

The Entergy System was a group of individual electric utilities ("Operating Companies") delivering energy services in Arkansas, Louisiana, Mississippi, and Texas (*Id.*, ¶ 2).  The utilities sold electricity principally to retail customers (*i.e.*, end users of electricity such as homeowners and businesses), but the utilities also made wholesale sales, including sales to non-Entergy utilities such as the City of North Little Rock's municipal utility, that in turn sold the electricity to their

---

[1] According to the D.C. Circuit:  "Section 206(b) of the FPA permits FERC, when ordering prospective relief under section 206(a), to order 'refunds of any amounts paid' in excess of the just and reasonable rate during a statutorily defined period . . . .  In short, FERC can order a refund of overcharges paid during a limited time period that begins after the filing of a complaint."  *Exxon Mobil Corp. v. F.E.R.C.*, 571 F.3d 1208, 1211–12 (D.C. Cir. 2009) (internal citations omitted).

[2] EAL concedes that this figure is 99.9992% of the FERC-Ordered Payment and explains in its complaint the rationale for this request and for EAL's alternative request for 86.13% of the FERC-Ordered Payment, given what EAL alleges was the past practice of the ASPC at the time of the FERC-Ordered Payment and at the time of the Opportunity Sale (Dkt. No. 1, ¶¶ 1, 42-44, 49, 68-69).

retail customers (*Id.*). A federal tariff, the Entergy System Agreement, governed the Entergy System and was approved by the FERC and was subject to FERC's exclusive jurisdiction (*Id.*). Under the Entergy System Agreement, although each Operating Company generally owned its own power plants, the Operating Companies' plants were operated centrally as if they were one large utility, and the costs and certain revenues of operation were then allocated among the Operating Companies (*Id.*).

From 2000 to 2009, EAL made short-term, usually one-month, wholesale sales known as "Opportunity Sales" to third party power marketers who were not members of the System Agreement (*Id.*, ¶ 3). *Louisiana Pub. Serv. Comm'n*, 165 F.E.R.C. ¶ 61022 at 1 n.3 (2018). The Entergy System treated these Opportunity Sales to third parties outside of the System Agreement as equivalent to EAL's electricity sales to its retail and long-term wholesale customers (Dkt. No. 1, ¶ 3). 165 F.E.R.C. ¶ 61022 at 5 n.3. For accounting purposes, this classification allowed EAL to source the energy for these Opportunity Sales from EAL's low-cost power plants (Dkt. No. 1, ¶ 3). The revenues of these Opportunity Sales were not shared with the other Operating Companies nor EAL's other customers (*Id.*).

The parties dispute whether the Opportunity Sales benefitted shareholders exclusively or also retail customers (Dkt. No. 20, at 7-9 ("Defendants' premise that EAL's shareholder[s] received the revenues from the Opportunity Sales and EAL's retail customers did not . . . is disputed")). When examining the Opportunity Sales as structured by EAL, the FERC concluded in October 2018 that EAL made "the off-system Opportunity Sales . . . to allow shareholders to recoup their investment costs, meaning that Entergy Arkansas shareholders were allowed to keep the profits from the Opportunity Sales." 165 F.E.R.C. ¶ 61022 at 5. APSC asserts this view of the Opportunity Sales should control the Court's analysis, not EAL's view of Opportunity Sales after

implementation of FERC's approach to the Opportunity Sales (Dkt. No. 21, at 2 ("Here, common sense shows that the Complaint is framed in the context of what was deemed to have happened to retail ratepayers for purposes of determining damages, not in the factual context of what they actually experienced as a result of EAL's misallocation of Opportunity Sales."). APSC also takes issue with EAL's view of Opportunity Sales and the impact on retail customers after implementation of FERC's approach to the Opportunity Sales (Dkt. No. 21, at 2 n.1).

For the Court's purposes in examining the pending motion, regardless of the Opportunity Sales' primary beneficiary, EAL's engagement in these sales prompted the LPSC to file a complaint against Entergy companies (Dkt. No. 1, ¶ 4). FERC ruled on that complaint on June 21, 2012, determining that the Entergy System's accounting approach, which allowed EAL to source the energy for the Opportunity Sales from EAL's low-cost power plants, was inconsistent with the Entergy System Agreement (*Id.*). FERC determined that the Entergy System Agreement authorized EAL to make the Opportunity Sales and that EAL had not acted imprudently in making such sales (*Id.*). However, FERC found that the Entergy System had misinterpreted accounting provisions in the Entergy System Agreement that FERC concluded were ambiguous (*Id.*).

Under FERC's interpretation of those provisions, the low-cost electricity from EAL's power plants that the Entergy System had deemed to fulfill EAL's Opportunity Sales should have instead been deemed to go predominantly to the retail customers of EAL and other Entergy Operating Companies, and the Opportunity Sales should have been deemed supplied by the highest-cost resources on the Entergy System, usually a power plant or other resource owned by a non-EAL Operating Company (*Id.*). Additionally, under FERC's interpretation, the revenues from the Opportunity Sales were to be included for the first time in accounting for these sales (*Id.*). In

particular, the cost of each Opportunity Sale was to be subtracted from the revenue from the Opportunity Sale, and the resulting "margin" was assigned to EAL (*Id.*).

FERC ordered the Entergy System to rerun its monthly accounting program using FERC's interpretation and to compare the rerun for each month to the Entergy System's original approach (*Id.*, ¶ 5). This rerun increased EAL's past costs relative to the past costs of the other Operating Companies, and FERC ordered EAL to pay refunds to the other Operating Companies to bring all the Operating Companies to the position they would have occupied had the Entergy System predicted and implemented FERC's interpretation originally (*Id.*).

FERC also recognized, however, a countervailing effect that should be included as an offset to the refunds (*Id.*). Under "bandwidth payment" provisions in the Entergy System Agreement, an Operating Company whose production costs are significantly lower than the System average cost must make an annual payment to other Operating Companies to achieve rough equalization of production costs among the Operating Companies (*Id.*). EAL was traditionally a low-cost Operating Company that made such annual payments (*Id.*). Now that FERC's ruling regarding accounting for the Opportunity Sales had increased EAL's past costs, EAL's past bandwidth payments should have been lower (*Id.*). This "bandwidth offset" amounted to $13,709,000 (*Id.*). FERC directed that it should be subtracted from the refund amount of $81,659,842 (*Id.*). The net refund amount was therefore $67,950,842, which, with $67,087,072 of accrued interest, totaled $135,037,914 (*Id.*). On December 14, 2018, EAL made the FERC-Ordered Payment to the other Operating Companies (*Id.*).

On May 9, 2019, EAL filed an application with the APSC seeking approval of a retail rate that would allow EAL to recover from its retail customers $135,036,833 of the FERC-Ordered Payment (*Id.*, ¶ 6). In a July 1, 2020, Order APSC denied the application to recover that amount

5

from the retail customers and ordered the utility to credit the $13,709,000 bandwidth offset plus interest to EAL's retail customers (*Id.*). On August 13, 2020, APSC denied EAL's petition for rehearing (*Id.*).

EAL filed this suit challenging the APSC decision to deny EAL's application to recover that amount from the retail customers and to order the utility to credit the $13,709,000 bandwidth offset plus interest to EAL's retail customers (*Id.*, at 1). APSC timely filed its motion to dismiss (Dkt. No. 15). EAL responded in opposition to the motion to dismiss, and APSC replied (Dkt. Nos. 20, 21). The Court held a telephonic hearing on the motion with counsel for both parties (Dkt. No. 26).

## II. Motion To Dismiss

### A. Legal Standard

A Federal Rule of Civil Procedure 12(b)(6) motion tests the legal sufficiency of the claim or claims stated in the complaint. *See Peck v. Hoff*, 660 F.2d 371, 374 (8th Cir. 1981). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although a complaint "does not need detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Stated differently, the allegations pleaded must show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

A court considering a motion to dismiss must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences from those facts in favor of the non-moving party, here, EAL.  *See Farm Credit Servs. of Am., FLCA v. Haun*, 734 F.3d 800, 804 (8th Cir. 2013); *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005); *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 914 (8th Cir. 2001).  However, a court need not credit conclusory allegations or "naked assertion[s] devoid of further factual enhancement."  *Retro Television Network, Inc. v. Luken Commc'ns, LLC*, 696 F.3d 766, 768 (8th Cir. 2012) (alteration in original) (quoting *Iqbal*, 556 U.S. at 678).  "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."  *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).  Finally, a court ruling on a motion to dismiss under Rule 12(b)(6) may consider documents or exhibits attached to a complaint, as well as matters of public and administrative record referenced in the complaint.  *See Owen v. Gen. Motors Corp.*, 533 F.3d 913, 918 (8th Cir. 2008); *Quinn v. Ocwen Fed. Bank FSB*, 470 F.3d 1240, 1244 (8th Cir. 2006).

In short, "[a] complaint shall not be dismissed for its failure to state a claim upon which relief can be granted unless it appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of a claim entitling him to relief."  *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001).

   **B.**  **Analysis**

EAL's complaint raises three claims against the APSC.  First, EAL argues that APSC's July 1, 2020, Order is preempted by federal law (*Id.*, ¶¶ 10-12).  Second, EAL maintains that APSC's July 1, 2020, Order violates the Dormant Commerce Clause (*Id.*, ¶ 13).  Third, EAL argues that the APSC's July 1, 2020, Order violates state law (*Id.*, ¶ 14).  EAL, in its request for relief, addresses among other matters both APSC's decision not to authorize EAL to recover from retail

7

customers $135,036,833 (or alternatively $116,308,155) and to order EAL to credit the bandwidth offset to retail customers while denying recovery of the FERC-Ordered Payment from those customers (Dkt. No. 1, at 39). In its motion to dismiss, APSC argues that EAL's complaint should be dismissed in its entirety "for failure to state claims upon which relief can be granted" (Dkt No. 15, at 1). The Court examines each claim.

### 1. EAL's Claim That APSC's July 1, 2020, Order Is Preempted By Federal Law

EAL alleges that "APSC's order is preempted under the filed rate doctrine and the Federal Power Act ('FPA') because APSC cannot deny EAL the ability to recover the appropriate portion of the FERC-Ordered Payment through EAL's retail rates." (Dkt. No. 1, ¶¶ 10-12). In its complaint, EAL maintains that "FERC ordered EAL to make the FERC-Ordered Payment (totaling $135,037,914) to other Operating Companies for the Opportunity Sales based on its interpretation of the Entergy System Agreement and its determination that Entergy Services' original accounting did not reflect the correct filed rate – *i.e.*, the rate set by the Entergy System Agreement. Thus, FERC ordered that the payment be made to enforce the filed rate under the Entergy System Agreement." (Dkt. No. 1, ¶ 91). Further, EAL alleges that, "[b]ecause the FERC-Ordered Payment is part and parcel of the filed rate under the Entergy System Agreement, the filed rate doctrine applies and APSC is required to allow EAL to recover the FERC-Ordered Payment by increasing EAL's retail rates." (*Id.*, ¶ 92). EAL argues that federal law requires APSC to allow EAL to recover the "filed rate," set by the Entergy System Agreement and interpreted exclusively by FERC (*Id.*, ¶¶ 10-12). EAL asserts that the FERC-Ordered Payment is "part and parcel" of the filed rate (*Id.*). EAL contends that the APSC's order denying EAL's application to recover the FERC-Ordered Payment violates the filed rate doctrine and is preempted and that the APSC's order is preempted "as it commands EAL to credit the Bandwidth Offset to retail customers. . .

8

because it impermissibly disaggregates the FERC-Ordered Payment by recognizing only one part of the FERC-Ordered Payment (the Bandwidth Offset) and not the rest." (*Id.*, ¶¶ 93-94).

APSC disagrees, arguing that EAL's "contention lacks facial plausibility because no factual showing has been (or could be) made that the Opportunity Sales damages ordered by FERC constitutes an interstate power rate to which the APSC must give binding effect in setting retail rates." (Dkt. No. 16, at 12). APSC asserts that the "preemptive effect of the filed rate doctrine applies only where a utility is seeking to pass through the costs of obtaining wholesale service that is used to supply retail ratepayers" (*Id.*, at 13). APSC maintains that the FERC-Ordered Payment is not such a cost (*Id.*, at 13-21).

The question of whether EAL has stated a plausible claim for relief based on preemption requires determining if the FPA or the filed rate doctrine could have any bearing on this case. The filed rate doctrine is a judicially created rule that ensures state regulators give binding effect to the wholesale rates set by FERC. *See Arkansas Power & Light Co. v. Missouri Pub. Serv. Comm'n*, 829 F.2d 1444, 1451 (8th Cir. 1987) (quoting *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 953 (1986)). The Supreme Court's holding in *Nantahala Power & Light Company v. Thornburg* best sums up the doctrine: "once FERC sets . . . a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable. A State must . . . give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority." 476 U.S. at 966. Moreover, the filed rate doctrine is not cabined to the rate setting context. *Id.* Its application does not end because the legal question at issue does "not deal in terms of prices or volumes of purchases." *Id.* Rather, the filed rate doctrine is an expansive judicial rule applied to a "comprehensive scheme of federal regulation[s]." *N. Nat. Gas Co. v. State Corp. Comm'n of Kan.*, 372 U.S. 84, 90–91 (1963).

9

FERC's rate setting power is extensive, but it is not absolute. The federal agency is limited in that it cannot "alter a rate retroactively." *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 578 (1981). However, this bar on retro-active rate changes is subject to a narrow exception found at 16 U.S.C. § 824(e).

> Section 206(b)[3] of the FPA permits FERC, when ordering prospective relief under section 206(a), to order 'refunds of any amounts paid' in excess of the just and reasonable rate during a statutorily defined period. . . . In short, FERC can order a refund of overcharges paid during a limited time period that begins after the filing of a complaint.

*Exxon Mobil Corp. v. F.E.R.C.*, 571 F.3d 1208, 1211–12 (D.C. Cir. 2009) (internal citations omitted); *see also* 16 U.S.C. § 824(e).

When the LPSC filed its original complaint, it did so under 16 U.S.C. § 824(e). 165 F.E.R.C. ¶ 61022 at 1. FERC then ordered EAL to pay $135,037,914 to compensate other Operating Companies within the Entergy System for the Entergy System's accounting error (Dkt. No. 1, ¶¶ 1, 4). EAL now seeks to recover this FERC-Ordered Payment from its retail customers (*Id.*, ¶ 1). At this stage of the proceeding, the Court is required to accept as true EAL's allegations in its complaint when evaluating the APSC's motion to dismiss (Dkt. No. 1). EAL's claim that APSC's order is preempted by federal law is plausible on its face, if the Court accepts EAL's allegations as true which it is required to do at this stage of the proceeding. Further, the parties identify at this stage of the proceeding factual disputes that cannot be resolved based solely on allegations in EAL's complaint or the documents before the Court. The filings, applicable case law, other relevant factors, and the well-pleaded facts in the complaint allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 662. The Court denies the APSC's motion to dismiss relating to Count 1 of EAL's complaint.

---

[3] Section 206 of the FPA corresponds to 16 U.S.C. § 824(e).

### 2. EAL's Claim That APSC's July 1, 2020, Order Violates The Dormant Commerce Clause

EAL's second claim alleges that the APSC's Order "violates the Dormant Commerce Clause of the U.S. Constitution, U.S. Const. art. I, § 8, because it discriminates against and burdens interstate commerce." (*Id.*, ¶ 13). EAL in its complaint maintains: "The FERC-Ordered Payment is a cost arising from interstate energy transactions that served wholesale customers inside and outside of Arkansas and retail customers inside Arkansas. All of the underlying transactions were part of interstate commerce. . . . When engaging in Opportunity Sales, and when engaging in exchanges of energy with other Operating Companies, EAL was participating in the wholesale market for energy, which is an interstate market." (Dkt. No. 1, ¶ 99). EAL asserts that the APSC's July 1, 2020, Order "has a discriminatory purpose" in that it denied EAL's application to recover FERC-Ordered Payment "because of its concern about the economic impact such costs would have on Arkansas retail customers." (Id., ¶ 101). Further, EAL argues that, by preventing EAL from recovering its costs for participating in interstate commerce, APSC's order has the "discriminatory effect" of shifting the costs of that energy "from EAL's retail customers onto EAL's out-of-state shareholder, its ultimate parent Entergy Corporation, which is incorporated under Delaware law and headquartered in Louisiana." (*Id.*, ¶ 102). APSC responds to EAL's claim by arguing that EAL fails to present a "plausible claim," as APSC asserts a legitimate purpose for the challenged state action (*Id.*, at 22-3).

The Constitution grants Congress exclusive power "to regulate commerce . . . among the several states." U.S. Const. art. I, § 8, cl. 3. *Grand River Enterprises Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 941 (8th Cir. 2009). The Dormant Commerce Clause arises from the "dormant implication of the Commerce Clause [that] prohibits state . . . regulation . . . that discriminates against or unduly burdens interstate commerce and thereby imped[es] free private trade in the

national marketplace." *Id*. (citing *R & M Oil & Supply, Inc. v. Saunders,* 307 F.3d 731, 734 (8th Cir. 2002). The Supreme Court has held that "[s]tate laws that discriminate against interstate commerce face 'a virtually *per se* rule of invalidity[,]. . . .' while state laws that 'effectuate a legitimate local public interest . . . [are] upheld unless the burden imposed on . . . [interstate] commerce is clearly excessive in relation to the putative local benefits.'" *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2091 (2018) (quoting *Granholm v. Heald,* 544 U.S. 460, 476 (2005); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

In the present case, EAL argues that APSC's order is discriminatory in both its effect and purpose, serving no legitimate local public interest (Dkt. No. 1, ¶¶ 101-02, 104). EAL points the Court to binding case law to demonstrate the plausibility of its assertion (*Id.*). *See also Middle S. Energy, Inc. v. Arkansas Pub. Serv. Comm'n*, 772 F.2d 404, 416-17 (8th Cir. 1985). EAL's complaint is not, in and of itself, dispositive of the merits of its claim. APSC's brief in support of its motion to dismiss identifies many reasons why APSC contends its July 1, 2020, Order serves a legitimate local interest (Dkt. No. 16, at 22-24). However, the merits of this case are not before the Court at this stage of the litigation. All that is required for the plaintiff to survive this motion to dismiss is a well-pleaded complaint, the factual content of which the Court views as true at this stage of the litigation, that can lead "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 662. The filings, case law, other relevant factors, and the well-pleaded facts in the complaint are more than speculative. *Id.* They allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* As such, Count 2 of EAL's complaint survives this motion to dismiss.

### 3. EAL's Claim Under Arkansas State Law

EAL, for Count 3 of its complaint, alleges that the APSC's July 1, 2020, Order is "invalid under Arkansas law because it is arbitrary and capricious, and not supported by substantial evidence." (Dkt. No. 1, ¶ 109). EAL maintains that the ASPC's July 1, 2020, Order "erred as a matter of law by holding that collateral estoppel barred EAL's application to recover the FERC-Ordered Payment based on previous decisions APSC had rendered in 2010 and 2011 in Dkt. No. 10-096-TF." (*Id.*, ¶ 110). First, EAL asserts that the issue of whether recovery of the FERC-Ordered Payment would violate Arkansas's prohibition on retroactive ratemaking was not raised in the earlier APSC proceedings and was not actually litigated and that, even if the same issue was presented, EAL did not have a full and fair opportunity to litigate the issue because EAL was unable to challenge the APSC's decision on the merits after FERC reversed its earlier decision to order refunds and EAL's federal lawsuit was dismissed as a result (*Id.*, ¶¶ 110-11). Second, EAL asserts that the APSC's July 1, 2020, Order "arbitrarily and capriciously concluded without substantial evidence that denial of EAL's application was in the public interest because the FERC-Ordered Payment was a wholesale business cost," which EAL maintains did not properly account for evidence "that the FERC-Ordered Payment in part reflects EAL's costs for providing electricity to retail customers" and the ways in which "the Opportunity Sales benefitted the retail customers . . . by reducing EAL's annual bandwidth payments that retail customers paid for through retail rates." (*Id.*, ¶ 112). Third, EAL alleges that the APSC's July 1, 2020, Order "concluded without substantial evidence that EAL had previously agreed to hold retail customers harmless for all costs arising from EAL's wholesale transactions." (*Id.*, ¶ 113). EAL maintains that it "had agreed only to exclude 13.87% of its fixed and variable generation production costs from retail rates." (*Id.*).

In support of its motion to dismiss, the APSC asserts that the requirements for collateral estoppel are met here, thus barring EAL's claim, because "EAL raised the same preemption

13

arguments in the instant matter as it did in the earlier case — as requiring the retail pass through of FERC-ordered refunds to other EOCs — in response to Order No. 12's (and the earlier APSC) ruling that the flow through was barred by Arkansas filed rate doctrine law" (Dkt. No. 16, at 25-26). Further, the APSC maintains that resolving that issue was essential to the APSC's earlier judgment and that EAL had a full and fair opportunity to litigate the issue (*Id.*, at 26-28).

The APSC's motion to dismiss Count 3 turns on whether EAL's 2010 application to pass on a FERC-ordered § 206 refund to retail customers collaterally estops EAL's ability to collect the FERC-Ordered Payment from retail customers now. *See generally In the Matter of the Application of Entergy Arkansas, Inc. for Approval of a Rider to Recover Certain Charges Arising from FERC Opinion Nos. 468 and 468-A and Related Orders*, Dkt. No. 10-096-TF, Appl. at 140 (Nov. 12, 2010) (hereinafter 10-096-TF, Appl.).

Collateral estoppel or issue preclusion is the legal principle that forbids parties involved in previous litigation from relitigating issues that the parties had a full and fair opportunity to litigate in a previous proceeding. *Powell v. Lane*, 289 S.W.3d 440, 444 (Ark. 2008). For an issue to qualify as precluded under collateral estoppel:

> (1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) that issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment.

*Id.*; *see also Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.5 (1979); *Lovell v. Mixon*, 719 F.2d 1373, 1376 (8th Cir. 1983). The test for issue preclusion is indistinguishable across the Eighth Circuit and in Arkansas state courts. *Compare Lovell*, 719 F.2d at 1376; *Powell*, 289 S.W.3d at 444.

The Court first examines the prior proceedings relied upon by the APSC for its assertion of collateral estoppel. The 2010 Cost Recovery Rider proceedings began, like the present case,

14

with an action brought by the LPSC where it sued under § 206 of the FPA. 16 U.S.C. § 824; *In the Matter of the Application of Entergy Arkansas, Inc. for Approval of a Rider to Recover Certain Charges Arising from FERC Opinion Nos. 468 and 468-A and Related Orders*, Dkt. No. 10-096-TF, Order No. 2 at 2 (June 2, 2011) (hereinafter 10-096-TF, Order No. 2). The LPSC complaint leading to the 2010 Cost Recovery Rider proceedings alleged that "the formula in the System Agreement for calculating . . . [members of the System Agreement's] Responsibility Ratios was unjust, unreasonable, and unduly discriminatory." *Id.* As a result of LPSC's complaint, FERC ordered EAL to pay refunds to the appropriate Operating Companies of the System Agreement. *Id.* at 3. EAL then petitioned the APSC to allow it to pass on this expense to its retail customers, citing federal preemption and pointing the APSC to a D.C. Circuit opinion discussing the implications of ratemaking on interstate commerce. *In the Matter of the Application of Entergy Arkansas, Inc. for Approval of a Rider to Recover Certain Charges Arising from FERC Opinion Nos. 468 and 468-A and Related Orders*, Dkt. No. 10-096-TF, Resp. Opp'n Staff Mot. Dismiss at 8 (Feb. 14, 2011) (hereinafter 10-096-TF, Resp. Opp'n Staff Mot. Dismiss); 10-096-TF, Appl.

The APSC rejected EAL's application to raise retail rates in the 2010 Cost Recovery Rider proceedings. *In the Matter of the Application of Entergy Arkansas, Inc. for Approval of a Rider to Recover Certain Charges Arising from FERC Opinion Nos. 468 and 468-A and Related Orders*, Dkt. No. 10-096-TF, Order No. 3 (July 29, 2011) (hereinafter 10-096-TF, Order No. 3); 10-96-TF, Order No. 2. The APSC reasoned that it could reject EAL's attempt to recover FERC-ordered § 206 refunds from retail ratepayers because "Congress contemplated that retail regulators could and would refuse to pass FERC-mandated refunds through to retail rates." 10-96-TF, Order No. 2 at 7. The APSC determined that it was necessary to resolve in the 2010 Cost Recovery Rider proceedings whether federal law precluded it from preventing utilities from passing FERC-ordered

§ 206 refunds to retail customers, as such a determination would "prevent additional litigation in . . . future cases." *Id* at 6.

EAL forewent appealing the APSC's 2010 Cost Recovery Rider decision in state court and challenged the decision in federal court. *Entergy Arkansas, Inc. v. Pub. Serv. Comm'n*, No. 4:11CV00655 SWW, 2012 WL 1415593, at *1 (E.D. Ark. Apr. 24, 2012); *see also* Ark. Code Ann. § 23-2-423 (laying out the process by which an APSC decision can be challenged in state court). In its federal court challenge, EAL argued, among other things, that federal law preempted the APSC's Cost Recovery Rider decision and that the "APSC's orders inflicted immediate injury by establishing a precedent intended to control the APSC's ruling on future applications to pass through FERC ordered refunds." *Id.* at *5, *7. The federal court dismissed EAL's case for lack of standing and ripeness. *Id.* at *6-7.

EAL maintains that the "issue presented in EAL's 2019 application (whether the filed rate doctrine required APSC to allow EAL to recover refunds ordered by FERC pursuant to *Section 309* of the FPA) is different from the issue decided by APSC's 2011 orders in Docket No. 10-096-TF, which concerned only whether EAL could recover refunds FERC ordered under *Section 206(b)* of the FPA based upon FERC's approval of an amendment to the System Agreement." (Dkt. No. 20, at 38).[4] EAL argues that, when it "filed its application with APSC to increase its retail rates to recover the cost of the Section 206(b) refunds, the opposing parties argued that the filed rate doctrine did not apply because Section 206(c) created an exception to the filed rate doctrine unique to Section 206(b) refunds that allowed APSC to deny EAL's recovery of FERC refunds on the state law ground that increasing EAL's rates would result in a retroactive rate

---

[4] Section 309 of the FPA provides, in part: "The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of [the FPA]."

16

increase prohibited under Arkansas law" (*Id.*, at 39). EAL contends that the APSC agreed with the opposing parties and held that "§ 206(c) of the FPA demonstrates that Congress intended to allow retail ratemakers to follow state law regarding § 206(b) refund costs." (*Id.*). EAL asserts that § 206(c) is "irrelevant to EAL's 2019 application to recover the FERC-ordered payment at issue here" because "FERC commanded EAL to make the FERC-ordered payment pursuant to FERC's authority under Section 309 of the FPA" to which § 206(c) does not apply (*Id.*, at 39-40).

Collateral estoppel is an affirmative defense. *See Stoebner v. Parry, Murray, Ward & Moxley*, 91 F.3d 1091, 1093-94 (8th Cir. 1996); *Oldham v. Pritchett*, 599 F.2d 274, 276 (8th Cir. 1979). For collateral estoppel to apply, the issue to be precluded must be the same as that involved in the prior action. EAL correctly observes that the APSC does not address in its briefing the distinction between § 206(b) refunds and § 309 refunds or how the APSC's holdings regarding § 206(c) apply to the FERC-ordered payment pursuant to § 309 (Dkt. No. 20, at 40). By not addressing these differences, the APSC has not carried its burden at this stage of the litigation to demonstrate that dismissal under Federal Rule of Civil Procedure 12(b)(6) based on collateral estoppel is appropriate. The parties also dispute whether EAL had a full and fair opportunity to litigate these issues in the prior proceeding, even if the issues are the same.

At this stage of the litigation and on the limited record before it, the Court cannot conclude that APSC is entitled to dismissal of EAL's Count 3 or any of EAL's other claims on the basis of collateral estoppel.

### 4. EAL's Request For Relief

APSC also moves to dismiss EAL's complaint asserting that EAL seeks mandamus relief that is unavailable (Dkt. No. 16, at 30-33). In its prayer for relief, EAL seeks the specific relief the APSC challenges but also requests that the Court "[a]ward such other relief available under

the law that may be considered appropriate under the circumstances. . . ." (Dkt. No. 1, at 40). The Court will not dismiss EAL's complaint at this stage of the litigation based on ASPC's contentions about the type of relief requested.

### C. Conclusion

After reviewing the filings, case law, and other relevant factors, and accepting as true all well-pleaded facts in the complaint and drawing all reasonable inferences from those facts in favor of the non-moving party, here EAL, the Court denies APSC's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. No. 15).

### III. Motion To Hold Further Proceedings In Abeyance

APSC also requests that the Court hold further proceedings in abeyance pending the Court's ruling on its motion to dismiss (Dkt. No. 15, at 32). Because the Court denies the APSC's motion to dismiss, the Court denies as moot EAL's request to hold in abeyance further proceedings in this matter (Dkt. No. 15).

It is so ordered this 31st day of March, 2022.

_Kristine G. Baker_
Kristine G. Baker
United States District Judge