IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

ENTERGY ARKANSAS, LLC                                        PLAINTIFF

v.                          CASE NO. 4:20-CV-01088-BSM

DOYLE WEBB, *et al.*                                         DEFENDANTS

<u>ORDER</u>

This case was tried to the bench over the course of three days, from February 13 to 15, 2023. Having listened to the testimony and reviewed the evidence, judgment is entered for the Arkansas Public Service Commission ("APSC") and against Entergy Arkansas, LLC ("EAL").

I. BACKGROUND

Should retail customers of EAL pick up part of the tab for a $135 million refund that the Federal Energy Regulatory Commission ("FERC") ordered EAL to pay to other energy companies? EAL sued Ted Thomas, Kimberly O'Guinn, and Justin Tate in their official capacities as APSC Commissioners[1] challenging APSC's order saying that they should not. In that order, *In the Matter of the Application of Entergy Arkansas, LLC for Approval of a Rider to Recover Certain Payments*, Docket No. 19-020-TF, Order No. 12 (APSC July 1, 2020) ("Order No. 12"), JTX-1155, APSC denied EAL's application for approval of a rider to recover from EAL's retail customers in Arkansas a portion of increased costs that FERC allocated to EAL. In compliance with FERC's orders, EAL paid the $135,037,914 net refund

_____

[1] Doyle Webb and Katie Anderson are substituted for Ted Thomas and Kimberly O'Guinn pursuant to Fed. R. Civ. P. 25(d).

to the other Entergy Operating Companies in the Entergy System.  EAL also returned the $13,709,000 bandwidth offset to retail customers.  EAL now seeks to recover a percentage of those costs from its Arkansas retail customers.

    A.   <u>Regulatory Framework</u>

Under the Federal Power Act ("FPA"), FERC regulates wholesale sales of electricity in interstate commerce, 16 U.S.C. § 824(b), and must ensure that wholesale rates are "just and reasonable." *Id*. § 824d(a); *Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 41 (2003).  "FERC's exclusive jurisdiction applies not only to wholesale rates but also to power allocations among integrated public utilities that affect wholesale rates." *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 371 (1988).  FERC has the power to make "just and reasonable" any public utility "rule, regulation, practice or contract affecting [a] rate, charge, or classification [that] is unjust, unreasonable, unduly discriminatory or preferential."  16 U.S.C. § 824e(a).

State regulators govern "[a]ll matters other than the transmission and wholesale sale of energy in interstate commerce." *Middle South Energy, Inc. v. Ark. Pub. Serv. Comm'n*, 593 F. Supp. 363, 366 (E.D. Ark. 1984), *aff'd*, 772 F.2d 404 (8th Cir. 1985); 16 U.S.C. § 824(a) and (b).  State regulators, including APSC, establish rates that public utilities may charge in retail sales, allowing utility companies to recover costs and a reasonable rate of return. *Entergy La.*, 539 U.S. at 42. "[I]nterstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility commissions determining intrastate rates." *Nahantala Power & Light Co. v. Thornburg*, 476 U.S. 953, 962 (1986).  Put another way,

FERC regulates interstate wholesale rates while APSC regulates intrastate retail rates, but APSC must give binding effect to wholesale rates filed by FERC.  That said, "it is often difficult to draw the distinction between interstate and intrastate power sales." *Middle South*, 593 F. Supp. at 366.

      B.    <u>Entergy Arkansas and the Entergy System</u>

EAL is a public utility company that provides electricity in Arkansas.  At all relevant times, EAL was a member of the Entergy System, which consisted of five Entergy Operating Companies ("EOCs") that operated in Arkansas, Louisiana, Mississippi, and Texas.  These EOCs shared capacity under an arrangement that allowed each EOC to access additional capacity when needed.  *Entergy La.*, 539 U.S. at 42.  The loads on the system were centrally dispatched using generators located across the system.  Under this sharing arrangement, costs of power generation and transmission were allocated among the EOCs.  This allocation of costs constitutes "the sale of electric energy at wholesale in interstate commerce" under the FPA. 16 U.S.C. § 824(b)(1); *Entergy La.*, 539 U.S. at 43 n. 1.

The Entergy System allocated costs through the Entergy System Agreement, a FERC-approved tariff originally executed in 1982.  Entergy System Agreement ("ESA") at 5, JTX-66.  The system agreement was administered by the Entergy operating committee, which consisted of a representative from each EOC and Entergy Services, which provided administrative services to the Entergy System.  *See Entergy La.*, 539 U.S. at 42.  The system agreement allowed the EOCs "to equalize the costs and benefits of generating energy." *Entergy Servs., Inc. v. FERC*, No. 17-1251, 2021 WL 3082798, at *1 (D.C. Cir. July 13,

3

2021).  The costs and revenues were run through a monthly invoice called the Intra-System

Bill ("ISB").  *Id.* at *2. EAL exited the system agreement in 2013, and it was terminated

three years later.  *La. Pub. Serv. Comm'n v. Entergy Corp.*, Opinion No. 565, 165 FERC ¶

61,022 at P 4 n. 11 (2018) ("Opinion 565"), JTX-1042.  EAL joined the Midcontinent

Independent System Operator ("MISO"), a different regional power grid, in 2013.  2/13 Tr.

96:4–8 (Castleberry).

Service Schedule MSS-3 of the system agreement governed how energy and

associated costs were allocated among the EOCs.  *See* Andrew Dornier Rebuttal Testimony

in APSC Docket No. 19-020-TF at 7, JTX-1119.  Two cost-allocation provisions of the

system agreement found in Service Schedule MSS-3 are significant here: sections 30.03 and

30.04.  Under section 30.03, energy from the lowest cost source available was to be allocated

"(a) first to the loads of the Company having such sources available . . . [and] (b) second to

supply the requirements of the other Companies' Loads (Pool Energy)."  ESA at 44–45;

*Entergy Servs.*, 2021 WL 3082798, at *1.  Under section 30.04, energy used to supply others

was to be provided in accordance with rate schedules on file with FERC.  ESA at 45.  As the

D.C. Circuit explained, under these provisions,

> the lowest-cost energy on the System was allocated to the 'loads' of the Entergy
> System member which produced that energy.  If that utility produced energy in excess
> of its 'loads,' then under section 30.03(b) it was deemed to have sent its excess energy
> to the pool, to be used by other System members to cover the requirements of their
> 'loads.' After energy was allocated to fulfill each of the System member's loads, the
> remaining energy—the most expensive on the System—was deemed to have been
> used to fulfill 'Sales to Others' under section 30.04.

*Entergy Servs.*, 2021 WL 3082798, at *2 (citation omitted).

To help allocate costs under the system agreement, each EOC carried a responsibility ratio, which is the ratio between the company's load responsibility and the system load responsibility. ESA 2.18; *Entergy Servs.*, 2021 WL 3082798, at *2. The responsibility ratio helped distribute the costs, revenues, and reserves among the companies equally. *Entergy Servs.*, 2021 WL 3082798, at *2. Each EOC's responsibility ratio was determined using a rolling average of its contribution to the monthly peak system load over the preceding twelve months. ESA 2.16–2.18.

The bandwidth remedy formula, also found in Service Schedule MSS-3 of the system agreement, ensured that no individual EOC had annual costs more than eleven percent above or below the system average. MSS-3 section 30.11, ESA at 51–52; *Entergy Servs.*, 2021 WL 3082798, at *2. If an EOC's annual costs were above or below these limits, "payments were made by the low cost Operating Companies to the high cost Operating Companies to equalize the distribution of costs." *Entergy Servs.*, 2021 WL 3082798, at *2 (cleaned up). Because EAL had low production costs, EAL made bandwidth payments to other EOCs with higher production costs from 2005 to 2009. EAL recovered these bandwidth payments from retail ratepayers through a Production Cost Allocation ("PCA") rider. Order No. 40, *In the Matter of the Application of Entergy Arkansas, Inc., for Approval of Changes in Rates for Retail Electric Service*, Docket No. 13-028-U (Jan. 9, 2015), Doc. No. 60-24.

In the years leading up to the current dispute, EAL and APSC reached a series of settlement agreements governing the allocation of certain fixed costs incurred by EAL. In

1985, APSC reached an agreement with EAL's predecessor, allowing it recover from retail customers 78% of the costs FERC allocated to the company for the construction of the Grand Gulf nuclear facility in Mississippi. *In the Matter of the Application of AP&L for Approval of Changes in Rates Applicable to Residential, General Service, Industrial, and Other Retail Electric Service*, Order No. 26, APSC Docket No. 84-249-U; Order No. 4, Docket No. 85-198-U (Sept. 9, 1985), PX-14. The remaining 22% was to be retained by EAL. 2/13 Tr. 71:5–11 (Castleberry). In 1997, APSC approved a settlement allocating a fixed level of EAL's wholesale load—13.87%— to EAL's wholesale business, not to its retail customers. *In the Matter of the Application of Entergy Arkansas, Inc. for Approval of Changes in Rates for Retail Electric Service*, Order No. 31, APSC Docket No. 96-360-U (Dec. 12, 1997), PX-19; Direct Testimony of Diana K. Brenske in Docket No. 19-020-TF, JTX-1109 at 11–13. As a result of these settlements, two tranches of EAL's capacity were excluded from its retail base: 91 MW of Grand Gulf capacity and 644 MW of slice-of-system capacity. Opinion 565, 165 FERC ¶ 61,022 at P 5.

From 2000 to 2009, EAL made short-term (lasting no longer than a month) wholesale sales of this excluded capacity to off-system customers. *Entergy Servs.,* 2021 WL 3082798, at *2. These sales were known as opportunity sales. EAL allocated the costs of these opportunity sales under section 30.03 of the MSS-3, treating the energy that supplied these sales as part of its own load. *Id.*

C.     FERC Proceedings—Docket No. EL06-61

In 2009, the Louisiana Public Service Commission ("LPSC") filed a complaint under

6

section 206 of the FPA, 16 U.S.C. § 824e, alleging that EAL's opportunity sales violated the system agreement.  Formal Complaint of LPSC in FERC Docket No. EL09-61, JTX-2.

After initial proceedings before an administrative law judge, FERC found that, while the system agreement authorized EAL to make the opportunity sales, EAL violated the system agreement by treating the sales as part of EAL's load under section 30.03 instead of as "sales to others" under section 30.04.  *La. Pub. Serv. Comm'n v. Entergy Corp.*, Opinion No. 521, 139 FERC ¶ 61,240 at P 106 (2012) ("Opinion 521"), JTX-372.  In reaching this determination, FERC found that the opportunity sales should be treated as "sales to others" based on the language of sections 30.03 and 30.04 and the context of the system agreement as a whole.  *Id.* at P 129.  FERC also found that the opportunity sales were made and priced in good faith.  *Id.* at P 136.  FERC ordered a rerun of the ISB to determine the difference between the energy costs allocated under the original accounting under section 30.03 and how they should have been accounted under section 30.04, and determined that the difference should be refunded to the other EOCs.  *Id.* at PP 135 and 136.

During further proceedings to determine the appropriate refund amount, FERC explained that "the goal of the damage proceeding was to put the parties as close as possible to the position they would have been in had the Opportunity Sales been correctly allocated for."  *La. Pub. Serv. Comm'n v. Entergy Corp.*, Opinion No. 548, 155 FERC ¶ 61,065 P 149 (2016) ("Opinion 548"), JTX-701.  To that end, FERC found that the damages calculation should be adjusted to reflect the impact of the opportunity sales on the system agreement's service schedules, including the bandwidth formula, had the accounting been done properly

7

in the first place.  *Id*. at P 9.  But FERC found that no changes to the system agreement were needed to calculate damages.  *Id*. at P 95.  And FERC determined that the distribution of damages between ratepayers and shareholders was outside the scope of the proceeding.  *Id*. at P 201.  FERC later reiterated its determination that the treatment of the bandwidth adjustment for purposes of retail rates was outside the scope of the proceeding.  *La. Pub. Serv. Comm'n v. Entergy Corp.*, Opinion No. 548-A, 161 FERC ¶ 61,171, P 11 (2017) ("Opinion 548-A"), JTX-1032.  As FERC stated, "[t]he setting of retail rates within the Entergy system is a matter for state commissions, and nothing in Opinion No. 548 prevents the Arkansas Commission from pursuing this issue about the flow through of adjustments for bandwidth reductions in an appropriate forum."  *Id*.

Following additional proceedings, FERC found that "the best method to determine the damages that Entergy Arkansas owes to the other Operating Companies is to do a full rerun of the ISB, with an adjustment to recognize the full amount of the additional bandwidth payments Entergy Arkansas made to the other Operating Companies as a result of Entergy's original incorrect accounting for the Opportunity Sales."  Opinion 565, 165 FERC ¶ 61,022 at P 75.  FERC reasoned that the other EOCs would receive double damages if the bandwidth payments were not considered in calculating damages.  *Id*. at P 76.  FERC also noted that LPSC could not point to any finding that the opportunity sales were imprudent, nor could it demonstrate that they were imprudently made.  *Id*. at P 77.

EAL, APSC, and LPSC sought judicial review of FERC's orders in the D.C. Circuit, which upheld the orders.  The D.C. Circuit concluded that FERC's interpretation of the

system agreement to require accounting for opportunity sales under section 30.04 was reasonable. *Entergy Servs.*, 2021 WL 3082798, at *5. The court also concluded that FERC reasonably ordered EAL to refund the other EOCs because EAL's "violation harmed the other operating companies and their customers by causing them to overpay for energy." *Id*. at *6. In reaching this conclusion, the court reasoned that EAL "would have retained a windfall from its violation" without a refund because EAL "made a substantial profit on the opportunity sales it misallocated." *Id*.

The D.C. Circuit also held that FERC's calculation of the refund was reasonable. *Id*. at *7. The court determined that FERC rationally reduced the refund to account for the excess bandwidth payments paid by EAL during the years at issue because the other EOCs "received more in bandwidth payments than they would have under the correct allocation." *Id*. at *8. The court further concluded that FERC rationally reduced the refund to reflect that EAL's responsibility ratio would have been lower had the opportunity sales been allocated correctly. *Id*. In upholding FERC's decision not to adjust the refunds to account for EAL's losses from the opportunity sales resulting from the ISB rerun, the court noted that EAL assumed sole responsibility for the opportunity sales and that FERC found "that responsibility included any negative margins resulting from the sales." *Id*. at *9. "Entergy Arkansas did not share the profits of the opportunity sales, so could not share its losses. Put another way, Entergy Arkansas 'must take the bitter with the sweet.'" *Id*. (citation omitted). Finally, the D.C. Circuit determined that FERC reasonably declined to address how the bandwidth reduction should be allocated between EAL's ratepayers and shareholders. *Id*.

9

at *11.  In reaching this conclusion, the court noted that "state commissions, like Arkansas, are responsible for setting retail rates for the Entergy System" and that Arkansas could litigate the issue in another forum.  *Id.*

In compliance with the FERC orders, EAL paid a total of $135,037,914 ($67,950,842 in principal plus $67,087,072 in interest) to the other EOCs in December 2018.  Entergy Services Compliance Filing Refund Report at 8, Docket No. EL09-61 (Dec. 17, 2018), JTX-1044.  The $67,950,842 principal amount included the unadjusted refund calculated by the ISB rerun ($81,659,842) less the bandwidth offset ($13,709,000). JTX-1044 at 7.

### D.    APSC Proceedings—Docket No. 19-020-TF

In May 2019, EAL applied to APSC for a retail rate surcharge to recover $135,036,834 from its retail customers.  *In the Matter of the Application of Entergy Arkansas, LLC for Approval of a Rider to Recover Certain Payments Arising from FERC Opinion No. 565 and Related Orders*, APSC Docket No. 19-020-TF, JTX-1060.  In its application, EAL contended that the federal filed rate doctrine and the Commerce Clause required APSC to allow EAL to recover an appropriate portion of the refund from retail customers.  *Id*. at 14–15.  EAL argued that the appropriate percentage to collect from retail customers was 99.9992 percent because that was the allocation factor in place when EAL made the refund payment to the other EOCs.  *Id*. at 16.  In the alternative, EAL argued that no lower than 86.13 percent should be allocated to retail customers, because an 86.13/13.87 retail/wholesale split was used until 2003.  *Id*. at 16–17.

APSC denied EAL's application a year later, following written testimony and briefing

from EAL, the Arkansas Attorney General, APSC staff, and the Arkansas Electric Energy Consumers, Inc. ("AEEC"). Order No. 12. In Order No. 12, APSC first found that the filed rate doctrine did not preempt it from considering the merits of EAL's application. *Id*. at 103. In APSC's view, FERC did not set a wholesale rate when it ordered the refund; instead, "it calculated a damages payment for violations" of the system agreement. *Id*. The filed rate doctrine does not apply, according to APSC, because "the damages payment is not the type of wholesale cost that could be impermissibly 'trapped' by this Commission." *Id*. at 104. APSC further concluded that the damages payment is not a cost incurred by EAL's "payment of just and reasonable FERC-set rates." *Id*.

After finding that the filed rate doctrine did not apply, APSC determined that collateral estoppel barred the consideration of EAL's application. *Id*. at 105. At issue was whether APSC's decision in an earlier proceeding, Docket No. 10-096-TF, precluded consideration of the issues in the current proceeding. In Docket No. 10-096-TF, EAL sought to recover a FERC-ordered damages payment from retail customers, which APSC denied. *Id*. at 106; *In the Matter of the Application of Entergy Arkansas, Inc., for Approval of a Rider to Recover Certain Charges Arising from FERC Opinion Nos. 468 and 468-A and Related Orders*, Docket No. 10-096-TF, Order No. 2 (June 2, 2010) and Order No. 3 (July 20, 2011). APSC determined that two issues raised and decided in that docket—"whether charging retail ratepayers for the refund costs would violate Arkansas law" and "whether the doctrine of federal preemption requires the pass-through of the refund costs to EAL's retail ratepayers"—are the same issues raised in the current docket. *Id*. at 106. APSC noted EAL's

contention that the issues were different because FERC ordered the refund in the current docket under section 309 of the FPA, not section 206(c) as in Docket No. 10-096-TF, but did not find that difference significant.  *Id*.

Even though APSC determined that collateral estoppel barred consideration of EAL's application, it considered the application on the merits anyway and concluded that recovery of the FERC-ordered refund from EAL's retail customers was not in the public interest. APSC concluded that EAL should not be allowed to recover from retail customers because those customers "should be placed in the position they would have been but for the improper allocation of the Opportunity Sales." *Id*. at 108.  If EAL were allowed to recover the refund from retail customers, APSC found, those customers "would be held solely responsible for EAL's wholesale business costs, an obligation which belongs entirely to EAL's shareholders." *Id*.  In support of this conclusion, APSC found that EAL had made representations in earlier proceedings, Docket Nos. 96-360-U and 03-028-U,  "that it would hold ratepayers harmless from the unforeseen costs of its wholesale business."  *Id*. at 108. Specifically, APSC pointed to EAL's agreement in Docket No. 96-360-U that it would "take steps to hold [EAL] ratepayers harmless from unforeseen events" and testimony from an EAL witness in Docket No. 03-028-U that "you will not have any cost or circumstances from the wholesale side flowing over on to the retail side" along with testimony from EAL's then-CEO that wholesale business costs could "never be reallocated to retail customers."  *Id*. at 109–110.

APSC also determined that the Dormant Commerce Clause does not require it to allow

EAL to recover from retail customers because the denial of EAL's application "does not result in EAL receiving different treatment from other utility companies in Arkansas." *Id*. at 110.   APSC noted that utility companies "may only recover costs that are 'reasonably necessary in providing utility service to ratepayers'" and determined that EAL's proposed treatment of the refund "is not such a cost." *Id*.  According to APSC, the denial of EAL's application "is an exercise of its traditional regulatory role, rather than an indication of discriminatory intent or economic protectionism." *Id*.

Not only did APSC deny EAL's request to recover the FERC-ordered refund from retail customers, it also ordered EAL to refund the $13,709,000 bandwidth offset to retail customers. *Id*. at 111–12.  APSC noted that EAL's improper accounting of the opportunity sales lowered EAL's total production costs while increasing the total production costs of the EOCs, resulting in increased bandwidth payments from EAL to the other EOCs. *Id*. at 112. And APSC pointed out that retail customers had already reimbursed EAL for the bandwidth payments. *Id*. at 111.  To put EAL retail customers in the place they would have been but for the improper accounting of the opportunity sales, APSC determined a refund of the bandwidth overpayments was proper. *Id*. at 112–13.   EAL credited the bandwidth offset—$15,446,957 including interest—to retail customers in August 2020.  Compliance Testimony of Myra Talkington, Docket No. 19-020-TF at 3–4, JTX-1165.

D.   Current Proceedings

After APSC denied its application to recover the net refund from retail customers, EAL filed this lawsuit.  EAL's complaint contains three counts.  Count I asserts that APSC

violated the filed rate doctrine.  Count II asserts that APSC violated the Dormant Commerce

Clause.  Count III asserts that APSC's order violates Arkansas law because it is arbitrary and

capricious and not supported by substantial evidence.

Nearly two and a half years of litigation followed before this case was tried.  AEEC

filed a motion to intervene, which was denied before trial, along with the parties' motions

for summary judgment.  The denial of AEEC's motion to intervene was affirmed. *Entergy*

*Ark., LLC v. Thomas*, 76 F.4th 1069 (8th Cir. 2023).  At trial, EAL offered five witnesses in

support of its position.  APSC did not proffer any witnesses, and maintained its position that

this case should only be decided on the administrative record.

## II. STANDARD OF REVIEW

This court has jurisdiction over Counts I and II pursuant to 28 U.S.C. § 1331 because

they arise under federal law.  This court has supplemental jurisdiction over Count III

pursuant to 28 U.S.C. § 1367(a).

The parties disagree as to what standard of review is appropriate and what evidence

I can consider.  EAL argues that this case is subject to a *de novo* determination, at least on

Counts I and II, of whether Order No. 12 violated federal law.  EAL's Proposed Findings of

Fact and Conclusions of Law at 46–47, Doc. No. 177.  EAL also contends that review is not

limited to the administrative record but should include evidence presented at trial.  *Id*. at

48–49.  APSC counters that Order No. 12 must be reviewed solely on the administrative

records of the proceedings before FERC and APSC.  APSC's Proposed Findings of Fact and

Conclusions of Law at 29,  Doc. No. 178.  APSC argues that this review is limited to whether

its findings are supported by substantial evidence and whether its actions were arbitrary or capricious. *Id*. at 21–26. APSC maintains that none of the evidence presented at the bench trial should be considered and that the trial itself was not appropriate. *Id*. at 9 n. 1.

As an initial matter, the law of the case doctrine does not control what evidence I can review. Before this case was transferred to me, Judge Baker, in ruling on EAL's motion to compel, determined that the case is not purely "an action for review on an administrative record" pursuant to Federal Rule of Civil Procedure 26(a)(1)(B)(i) and permitted discovery on Counts I and II. Doc. No. 43. EAL contends that Judge Baker's ruling is the law of the case, and that I am held to her earlier ruling. Under the law of the case doctrine, courts must "adhere to decisions made in earlier proceedings in order to ensure uniformity of decisions, protect the expectations of the parties, and promote judicial economy." *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 830 (8th Cir. 2008). The doctrine applies to final decisions made by district courts that have not been appealed, but it does not apply to interlocutory orders. *Id*. Because Judge Baker's order on the motion to compel was an interlocutory order, law of the case does not apply. *See FirsTier Mortg. Co. v. Investors Mortg. Ins. Co.*, 498 U.S. 269, 276 (1991) (a discovery ruling is "clearly" an interlocutory decision).

Even though I am not bound by Judge Baker's ruling, I agree with it. Counts I and II are subject to a *de novo* determination, and evidence presented at trial, even if not presented in the administrative proceedings, will be considered. The cases cited by APSC for the proposition that review is limited to the administrative record involve federal courts

reviewing decisions by federal agencies—*e.g., Camp v. Pitts*, 411 U.S. 138 (1973) (reviewing action by the Comptroller of the Currency); *Robinette v. Comm'r*, 439 F.3d 455 (8th Cir. 2006) (reviewing action by IRS); *Iowa League of Cities v. EPA*, 711 F.3d 844 (8th Cir. 2013) (reviewing letters sent by EPA)—or Arkansas courts reviewing decisions by Arkansas agencies—*e.g., Ark. Contractors Licensing Bd. v. Pegasus Renovation Co.*, 347 Ark. 320, 64 S.W.3d 241 (2001) (reviewing action by state licensing board).  But this is not an appeal under the Administrative Procedure Act.  Other federal courts have reviewed actions by state public service commissions *de novo*, including *PPL Energyplus, LLC v. Nazarian*, 974 F. Supp. 2d 790 (D. Md. 2013) (bench trial deciding whether state commission order was preempted or violated Dormant Commerce Clause); *AEP Texas Cent. Co. v. Hudson,* 441 F. Supp. 2d 810 (W.D. Tx. 2006) (bench trial deciding whether state public utilities commission order was preempted); and *Middle South Energy*, 593 F. Supp. 363 (hearing on whether APSC proceedings were preempted or violated Dormant Commerce Clause).  Accordingly, evidence presented at trial will be considered on EAL's preemption and Dormant Commerce Clause claims.

Review of Count III, however, is limited to the administrative record pursuant to Arkansas Code Annotated section 23-2-423(b)(2).  Accordingly, evidence outside the administrative record will not be considered.  On this count, review of Order No. 12 is limited to whether there is substantial evidence to support APSC's findings.  *See* Ark. Code Ann. § 23-2-423(c)(4) ("[R]eview shall not be extended further than to determine whether the commission's findings are supported by substantial evidence and whether the commission

has regularly pursued its authority, including a determination of whether the order or decision under review violated any right of the petitioner under the laws or Constitution of the United States or of the State of Arkansas."). The order will be upheld if it is supported by substantial evidence and not arbitrary or capricious. *Petit Jean Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 2022 Ark. App. 215, at 11–12, 646 S.W.3d 123, 132.

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

For the reasons stated below, judgment is entered for APSC and against EAL.

A.    Does Order No. 12 Violate the Filed Rate Doctrine?

Order No. 12 does not violate the filed rate doctrine because the FERC-ordered refund is not part of the filed rate.

*1. Filed Rate Doctrine*

In Count I of its complaint, EAL argues that APSC's refusal to allow it to recover a portion of the refund from retail customers violates the filed rate doctrine. The filed rate doctrine applies to state regulators as a matter of federal preemption through the Supremacy Clause. *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 581–82 (1981). This doctrine requires "that interstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility commissions determining intrastate rates." *Entergy La.*, 539 U.S. at 47 (quoting *Nantahala*, 476 U.S. at 962); *see also Mississippi Power & Light*, 487 U.S. at 373 (holding that "a state utility commission setting retail prices must allow, as reasonable operating expenses, costs incurred as a result of paying a FERC-determined wholesale price.... Once FERC sets such a rate, a State may not conclude in setting retail rates that the

17

FERC-approved wholesale rates are unreasonable").  "When FERC sets a rate between a seller of power and a wholesaler-as-buyer, a State may not exercise its undoubted jurisdiction over retail sales to prevent the wholesaler-as-seller from recovering the costs of paying the FERC-approved rate."  *Nantahala*, 476 U.S. at 970.  In other words, a state cannot "trap" those costs.  *Id*.  Trapping occurs when a utility "cannot fully recover its costs of purchasing at the FERC-approved rate."  *Id*.

Under the filed rate doctrine, "FERC-approved cost allocations between affiliated energy companies may not be subjected to reevaluation in state ratemaking proceedings."  *Entergy La.*, 539 U.S. at 41–42.  *Nantahala*, *Mississippi Power & Light*, and *Entergy Louisiana* applied the filed rate doctrine to prohibit state regulators from failing to give effect to cost allocations among utility companies.  In *Nantahala*, FERC approved a certain apportionment of low-cost power to a utility company, but the state regulator determined that the utility's share of the low-cost power was higher than that allocated by FERC.  476 U.S. at 960–61.  As a result, the utility company was unable to recover the full costs of acquiring power, and a portion of those costs was "trapped" in violation of the filed rate doctrine.  *Id*. at 971.  *Mississippi Power & Light* involved FERC's allocation of costs associated with the construction of the Grand Gulf nuclear plant to the participating operating companies.  487 U.S. at 356.  State courts declined to allow the utility to pass those costs to retail customers without a prudence review.  *Id*. at 367.  The Supreme Court concluded that FERC's allocation preempted a state prudence review of the utility's decision to participate in the nuclear plant, reasoning that "FERC-mandated allocations of power are binding on the

18

States, and States must treat these allocations as fair and reasonable when determining retail rates." *Id.* at 371. In *Entergy Louisiana*, the state regulator would not allow the utility company to charge retail rates that would allow it to recoup certain payments made to the other EOCs under the Entergy system agreement. 539 U.S. at 45–46. The Court held that the state order impermissibly trapped costs that were allocated in a FERC tariff. *Id.* at 49. These cases make clear that the preemptive effect of FERC jurisdiction does not turn on whether a particular matter was actually determined in the FERC proceedings. *Miss. Power & Light*, 487 U.S. at 374.

FERC has the power to order refunds for violations of filed rates, as it did here. *Boston Edison Co. v. FERC*, 856 F.2d 361, 369 (1st Cir. 1988) (FERC "can enforce the terms of a filed rate and order refunds for past violations of one"). FERC may order a refund of portions of newly-filed rates or charges "found not justified," 16 U.S.C. § 824d(e); it may order a refund after finding a rate "unjust, unreasonable, unduly discriminatory, or preferential," *Id.* § 824e(b); or it may order refunds of amounts improperly collected in excess of the filed rate. *Id.* § 825h. *Towns of Concord, Norwood & Wellesley, Mass. v. FERC*, 955 F.2d 67, 72–73 (D.C. Cir. 1992).

## 2. Is Refund a Filed Rate?

Is the FERC-ordered refund for the misallocation of EAL's opportunity sales part of the filed rate? EAL argues that it is, and that APSC must therefore allow EAL to recover a portion of the refund from retail customers, or costs would be impermissibly trapped. *See* 2/15 Tr. 457: 22–24 (Massey) (stating that "any remedy that is imposed by FERC to

effectuate the filed rate becomes part and parcel of the filed rate."). APSC counters that it is not, and that retail customers received no benefit from the opportunity sales and so should not be burdened with paying the refund arising from misallocation of those sales.

It is undisputed that the Entergy System Agreement was a filed rate. Order No. 12 at 7. And the accounting provisions at issue in the FERC proceedings—sections 30.03, 30.04, and 30.11 through 30.13—are included in Service Schedule MSS-3 of that system agreement. JTX-66. But it does not necessarily follow that a refund for a violation of that agreement is part of the filed rate such that EAL must be allowed to pass on the costs to its retail customers.

The parties dispute the effects of the opportunity sales on EAL's retail customers. EAL made the opportunity sales to defray costs associated with the excluded assets—created by settlement agreements in APSC Docket No. 84-249-U and Docket No. 96-360-U— that it was not allowed to pass through to retail customers. 2/13 Tr. 83:4–7 (Castleberry) ("So that capacity or those excluded assets in that retained share, we had to do something with them until we figured out what else we could do with them for the long term. That's when the opportunity sales came into play."). There was some testimony at trial that the opportunity sales benefitted retail customers. Kurtis Castleberry testified that the opportunity sales allowed EAL to keep its generating assets rather than selling them off and allowed EAL to enter MISO on more favorable terms. 2/13 Tr. 95–99. William Massey testified that, under the original accounting, retail customers underpaid for energy, 2/15 Tr. 462:21–463:2, while Bruce Louiselle testified that, had the opportunity sales been allocated correctly in the

20

first place, EAL's increased production costs would have been included in the filed rate and would have been allocated in part to retail customers.  2/13 Tr. 207:8–22.

I find that, on balance, the opportunity costs provided little benefit to retail customers. Retail customers did not receive energy from the generating resources that supported the opportunity sales. 2/13 Tr. 125:19–21 (Castleberry).  Retail customers did not pay costs associated with the resources used for opportunity sales. 2/13 Tr. 80:4–8 (Castleberry). EAL's shareholders bore those costs. 2/13 Tr. 111:20–23 (Castleberry).  Likewise, revenues from the opportunity sales did not go to retail customers. 2/13 Tr. 112:20–113:1 (Castleberry).  The capacity that EAL sold through opportunity sales was capacity for which EAL—not retail customers—was responsible.  Any purported benefit that retail customers might have received had the opportunity sales been allocated correctly is speculative.

Order No. 12 is not preempted by the filed-rate doctrine.  The payments EAL made to the other EOCs are unlike the costs at issue in *Nantahala*, *Miss. Power & Light*, and *Entergy Louisiana*.  In those cases, state regulators prevented utilities from recovering from retail customers FERC-approved costs of acquiring energy ultimately destined for those customers.  By contrast, the opportunity sales were purely wholesale sales; costs associated with acquiring power for those sales were kept separate from retail.  The FERC-ordered refund is not a FERC-approved filed rate; rather, it was a refund to the other EOCs for a misallocation of the opportunity sales in violation of the system agreement.  The opportunity sales were made in good faith and not imprudent.  But the way in which they were accounted nonetheless violated the system agreement and caused the other EOCs to overpay.  EAL

21

made the opportunity sales to minimize its losses; essentially, to lose less money than it would have absent the sales. EAL's shareholders received the revenues from those sales and bore the risk too. As it turned out, the FERC-ordered ISB rerun led to increased costs of those sales. But retail customers—who did not benefit from the opportunity sales—should not be required to pay for losses associated with the sales years after those sales concluded. The filed rate doctrine does not require APSC to allow EAL to flow through to retail customers costs from wholesale business activities that were kept separate from retail.

### 3. Different Treatment of Bandwidth Offset

EAL also argues that the filed rate doctrine requires the APSC to allow it to recover both the unadjusted refund and the bandwidth offset because they together are part of the filed rate. Recall that bandwidth payments were made to ensure that each EOC's annual costs were no more than eleven percent above or below the system average. The bandwidth offset and unadjusted refund are both products of the FERC-ordered ISB rerun. In EAL's view, the net refund cannot be disaggregated into an unadjusted refund of approximately $80 million and bandwidth offset of approximately $14 million. *See* Dornier Testimony at 22–23, JTX-1119 ("[I]t would be inconsistent and unreasonable to isolate selected portions of the ISB re-runs where the FERC-ordered refund required that the ISB re-runs be made to determine the cumulative effect of removing the Opportunity Sales from EAL's load and instead treat them as Sales to Others.").

The opportunity sales, as they were originally allocated under section 30.03, lowered EAL's total production costs, resulting in bandwidth payments from EAL to the other EOCs.

EAL recovered the bandwidth payments from retail customers from 2005 to 2009. These bandwidth payments were flowed through to retail customers by Rider PCA. 2/14 Tr. 370:20–371:4 (Hunt). As EAL's costs increased after the ISB rerun, the bandwidth payments it owed to the other EOCs decreased. Opinion No. 565, 165 FERC ¶ 61,022 at P 75. The net refund FERC ordered EAL to pay to the other EOCs was accordingly decreased by $13,709,000, the amount that EAL was determined to have overpaid in bandwidth payments.

After EAL paid the FERC-ordered refund to the other EOCs, those companies returned their share of the net refund to their retail customers, *see* PX-34, PX-36, PX-37, PX-61, except for Entergy New Orleans, which used its share to create a relief fund for customers affected by the COVID-19 pandemic. PX-40. 2/14 Tr. 354–64 (Hunt). Unlike EAL, the other EOCs did not treat the unadjusted refund amount as separate from the bandwidth offset when passing the refund along to retail customers.

That the other EOCs did not disaggregate the net refund does not control how APSC should treat the bandwidth offset. Recall that the D.C. Circuit determined that the allocation of the bandwidth offset between shareholders and ratepayers was a matter for state regulators. *Entergy Servs.*, 2021 WL 3082798, at *11. Order No. 12 properly directed EAL to return the bandwidth offset to its retail customers. The bandwidth payments are part of the filed rate. Retail customers were responsible for those payments. As it turns out, they overpaid due to the misallocation of costs associated with the opportunity sales. The filed rate doctrine does not prevent the APSC from requiring EAL to refund those overpayments to retail customers.

23

B.     Does Order No. 12 Violate the Dormant Commerce Clause?

Order No. 12 does not violate the Dormant Commerce Clause because it is not overtly discriminatory and does not unduly burden interstate commerce.

The Dormant Commerce Clause prohibits the enforcement of state laws that discriminate against interstate commerce. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369–70 (2023). A state law challenged under the Dormant Commerce Clause is subject to a two-tier analysis. *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 593 (8th Cir. 2003). First, the court determines whether the challenged law discriminates against interstate commerce. *Or. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 99 (1994). Discrimination means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.* If the law is discriminatory, it is invalid unless the state can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest. *S.D. Farm Bureau*, 340 F.3d at 593. Second, if the law is not overtly discriminatory, it will be struck down "only if the burden it imposes on interstate commerce 'is clearly excessive in relation to its putative local benefits.'" *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). The "crucial inquiry" is "whether the APSC's action 'is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental.'" *Middle South Energy, Inc. v. Ark. Pub. Serv. Comm'n*, 772 F.2d 404, 416 (8th Cir. 1985) (quoting *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)).

"[T]he regulation of utilities is one of the most important of the functions traditionally

24

associated with the police power of the states." *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983).  The state has a "clear and substantial governmental interest" in fair and efficient rates.  *Middle South*, 772 F.2d at 412.  But the effect of the production and transmission of energy "on interstate commerce is often significant enough that uncontrolled regulation by the States can patently interfere with broader national interests."  *Ark. Elec. Coop. Corp.*, 461 U.S. at 377.

### 1. Overt Discrimination

Under the first tier of analysis, I conclude that Order No. 12 is not overtly discriminatory.

State law may be considered to be economic protectionism if it has either a discriminatory purpose or discriminatory effect.  *Middle South*, 772 F.2d at 416.  EAL argues that Order No. 12 has both.  EAL contends that APSC was motivated by a concern about the economic impact of higher rates on retail customers in Arkansas.  EAL also contends Order No. 12 has the discriminatory effect of excluding high-cost electricity in order to protect Arkansas retail customers, thereby forcing EAL's out-of-state shareholders to pay for those costs.  EAL points out that, as a result of the FERC orders, some of the energy deemed to supply the opportunity sales came from outside of Arkansas, and by refusing to allow EAL to flow through those costs to retail customers, APSC is unconstitutionally excluding that high-cost energy from out of state.

In *Middle South*, APSC sought to prevent AP&L, EAL's predecessor, from participating in the Grand Gulf nuclear power plant, even after FERC obligated operating

companies, including AP&L, to share in costs associated with the project. 772 F.2d at 408. To that end, APSC began formal inquiries into AP&L's role in the project. *Id.* The *Middle South* court found that APSC's actions had a discriminatory purpose, noting that the actions were rooted in concerns about the economic impact of AP&L's participation in Grand Gulf. *Id.* at 416. APSC also wanted to deflect rate increases from Arkansas retail customers and shift the economic burden to citizens of other states. *Id.* at 416–17. The court determined that APSC wanted "to close [the state's] borders to high-cost electricity," which would be a direct and substantial burden on interstate commerce. *Id.* at 417.

Unlike APSC's actions in *Middle South*, Order No. 12 is not economic protectionism. As APSC stated in Order No. 12, the denial of EAL's application was an "exercise of its traditional regulatory role, rather than an indication of discriminatory intent or economic protectionism." Order No. 12 at 110. APSC has the power to ensure that public utilities, including EAL, can only recover costs that are "reasonably necessary in providing utility service to ratepayers." *Id.* (quoting *Entergy Ark., Inc. v. Ark. Pub. Serv. Comm'n*, 104 Ark. App. 147, 162, 289 S.W.3d 513, 525 (2008)). The costs arising from the FERC-ordered revised accounting of the opportunity sales are not reasonably necessary to serve EAL's retail customers, and APSC acted within its traditional regulatory role in declining to allow EAL to pass those costs onto customers. Moreover, there is no indication that EAL was treated differently because its shareholders were not located in Arkansas; rather, the effects of Order No. 12 on out-of-state investors are incidental.

*2. Balancing*

26

Because Order No. 12 is not overtly discriminatory, the next question is whether the burden it imposes on interstate commerce is clearly excessive in relation to local benefits. *See Pike*, 397 U.S. at 142.  I conclude that it is not.

Order No. 12 has clear local benefits.  The order benefits Arkansas retail electricity customers by preventing EAL from passing approximately $135 million in increased costs associated with the opportunity sales to them and allowing them to recover approximately $13.7 million in bandwidth overpayments.

EAL argues that any benefits realized by Arkansas retail ratepayers are outweighed by negative effects on interstate commerce.  At trial, Dr. John Morris testified that additional costs from the FERC-ordered accounting rerun would be borne by out-of-state Entergy investors, including pension funds.  2/15 Tr. 525:18–526:6.  Dr. Morris testified that, in his opinion, Order No. 12 also created a negative incentive effect that could increase costs to ratepayers in other states.  2/15 Tr. 587:10–17.  He said that Order No. 12 would discourage EAL from participating in bilateral wholesale sales, which would burden interstate commerce.  2/15 Tr. 531:20–22.  But he could not quantify any potential effects on EAL's willingness to source energy from out of state, 2/15 Tr. 552:7–13, or on EAL's wholesale business.  2/15 Tr. 620:10–624:16.  Dr. Morris could not identify an adverse effect of Order No. 12 on Entergy's stock value, 2/15 607:21–608:1, nor could he point to an increase in Entergy's financing costs.  2/15 Tr. 605:2–11.

William Massey testified about the impact of Order No. 12 on interstate energy markets.  Mr. Massey testified that other utility companies would be less likely to participate

in wholesale markets or regional power pools as a result of Order No. 12.  2/14 Tr. 392:20–23.  Mr. Massey also testified that, if trapping of costs became the norm, large regional institutions like the Entergy System could not exist, and FERC's policy of encouraging regional coordination would be frustrated. 2/14 Tr. 397:4–15.  But he could not identify other states trapping costs after the order.  2/15 Tr. 453:15–22.

I find the negative effects on interstate commerce identified by EAL's witnesses at trial to be largely speculative and not "clearly excessive" in relation to the benefits gained by Arkansas retail customers from not having to pay for EAL's wholesale business costs. Accordingly, I conclude that Order No. 12 does not violate the Dormant Commerce Clause.

C.    Is Order No. 12 Invalid under Arkansas Law Because it is Arbitrary and Capricious, and Not Supported by Substantial Evidence?

Order No. 12 is not arbitrary and capricious and is supported by substantial evidence. As discussed above, Count III is considered solely on the administrative record.

A reviewing court must affirm an APSC order if it is supported by substantial evidence and is neither unjust, arbitrary, unreasonable, unlawful, nor discriminatory. *Entergy Ark.*, 104 Ark. App. at 154, 289 S.W.3d at 520.  To prove that the APSC's order was not supported by substantial evidence, EAL must show that the proof before the APSC "was so nearly undisputed that fair-minded persons could not reach its conclusion." *Id*.  To prove that APSC's order was arbitrary and capricious, EAL must show that the order "was a willful and unreasoning action, made without consideration and with a disregard of the facts or circumstances of the case." *Id*. at 154–55, 289 S.W.3d at 520.

28

*1. Collateral Estoppel*

APSC misapplied collateral estoppel in Order No. 12, but that misapplication does not matter because it went on to rule on the merits.  For collateral estoppel, or issue preclusion, to apply, (1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) the issue must have been actually litigated; (3) it must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment. *Miss. Cnty. v. City of Blytheville*, 2018 Ark. 50, at 10, 538 S.W.3d 822, 829.  The party against whom collateral estoppel is asserted must have been a party to the earlier action and must have had a full and fair opportunity to litigate the issue in that first proceeding. *Powell v. Lane*, 375 Ark. 178, 185, 289 S.W.3d 440, 444 (2008).

The APSC incorrectly applied collateral estoppel because the issue litigated in the earlier proceeding, Docket No. 10-096-TF, involved a refund under sections 206(b) and 206(c) of the FPA, which govern FERC's authority to fix rates.  16 U.S.C. § 824e(b) and (c).  But this case concerns a refund under section 309 of the FPA, which relates to FERC's authority to enforce an existing rate.  16 U.S.C. § 825h.  Refunds ordered under section 309 were not addressed in Docket No. 10-096-TF, so EAL did not have an opportunity to litigate that issue.  In any event, after finding that collateral estoppel barred EAL's claims, APSC considered those claims on the merits anyway.  So even though APSC improperly applied estoppel, it makes no difference to the outcome here.

*2. Arbitrary and Capricious*

APSC's finding that it was not in the public interest to permit EAL to recover the

FERC-ordered refund from retail customers was not arbitrary or capricious.  EAL contends that APSC takes EAL's representations that it would hold retail customers harmless out of context.  At issue are two APSC proceedings: Docket Nos. 96-360-U and 03-028-U.  In the settlement agreement in Docket No. 96-360-U, EAL represented that it would "take steps to hold [EAL] ratepayers harmless from unforeseen events." Order No. 31, Docket No. 96-360-U, PX-19.  In Docket No. 03-028-U, an EAL witness testified that the agreement in Docket No. 96-360-U meant that "you will not have any costs or circumstances flowing over on to the retail side." Testimony of Andrew P. Frits, Docket No. 03-028-U.  EAL's then-CEO also testified that EAL's wholesale business costs could "never be reallocated to retail customers." Testimony of Hugh T. McDonald, Docket No. 03-028-U.  EAL argues that its representations in the 1996 docket were made regarding the transition to retail electricity competition and that the testimony in the 2003 docket concerned a modification of cost allocation between wholesale and retail customers.

I agree with EAL that APSC took EAL's representations in the prior proceedings out of context, and I find that EAL did not agree to hold retail customers harmless from all unforeseen events.  But it does not follow that Order No. 12 was arbitrary and capricious.  APSC did not rely solely on these purported hold-harmless representations in formulating the order.  APSC issued Order No. 12 after considering extensive testimony from EAL, the Attorney General, APSC staff, and AEEC.  As explained above, Order No. 12 does not violate the filed rate doctrine or the Dormant Commerce Clause.  Therefore, I conclude that Order No. 12 is not arbitrary or capricious under Arkansas law and is supported by

substantial evidence.

## IV. CONCLUSION

Based on the foregoing facts and law, judgment is entered for the Arkansas Public

Service Commission, and this case is dismissed with prejudice.

IT IS SO ORDERED this 7th day of March, 2024.

_____
UNITED STATES DISTRICT JUDGE